IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 29, 2013 Session

# EDWARD THOMAS KENDRICK, III v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 220622   Don W. Poole, Judge**

**No. E2011-02367-CCA-R3-PC - Filed June 27, 2013**

Edward Thomas Kendrick, III ("the Petitioner")[1] was convicted by a jury of first degree premeditated murder. This Court affirmed the Petitioner's conviction on direct appeal. The Petitioner filed for post-conviction relief, alleging ineffective assistance of counsel. After a hearing, the post-conviction court denied relief, and this appeal followed. Upon our thorough review of the record and the applicable law, we are constrained to conclude that the Petitioner established that he received the ineffective assistance of counsel at trial, because it is reasonably likely that a jury would have convicted him of a lesser degree of homicide absent the deficiencies in his trial counsel's performance. Accordingly, we must reverse the Petitioner's conviction and remand this matter for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Reversed; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Ann C. Short (on appeal), Knoxville, Tennessee; Jeffrey Schaarschmidt and Jason Demastus (at post-conviction hearing), Chattanooga, Tennessee, for the Appellant, Edward Thomas Kendrick, III.

Robert E. Cooper, Jr., Attorney General & Reporter; Lacy Wilbur, Assistant Attorney General; Bill Cox, District Attorney General; and Lance Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The Petitioner identifies himself as "Edward Thomas Kendrick, III" in his petition for post-conviction relief filed on April 15, 1998. We note that this Court's opinion addressing the Petitioner's direct appeal from his conviction identifies the Petitioner as "Edward Thomas Kendricks, III, alias Edward Thomas Kendrick, III."

# OPINION

## Factual and Procedural Background

*Trial*

On March 6, 1994, the Petitioner shot and killed his wife. A jury subsequently convicted the Petitioner of first degree premeditated murder, and the Petitioner was sentenced to life imprisonment. This Court affirmed the Petitioner's conviction on direct appeal. See State v. Kendricks, 947 S.W.2d 875, 886 (Tenn. Crim. App. 1996). To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

> On March 6, 1994, at approximately 10:00 p.m., the [Petitioner] drove to the gas station at which Lisa Kendrick, his wife and the victim, worked. With him in the car were their four-year-old daughter and three-year-old son. These children were sitting in car seats in the back seat of the station wagon the [Petitioner] was driving. Also in the car, on the front passenger floorboard, was the [Petitioner's] loaded 30.06 hunting rifle.

> The [Petitioner] pulled into the station, parked, and went into the market portion of the station where his wife worked as a cashier. He asked her to come outside, which she did. She and the [Petitioner] went to the car where she spoke briefly to the children. The [Petitioner] retrieved the rifle from the front passenger floorboard and carried it to the back of the car. At that point, the weapon fired once, the bullet striking the victim in her chest and killing her almost instantly.

> After the victim fell to the parking lot, the [Petitioner] briefly bent over her body, put the gun back in the car, and drove toward the airport a short distance away. On the way, he threw the rifle out of the car. Once he arrived at the airport, he called 911 and reported that he had shot his wife. Before the [Petitioner] left the gas station, he took no action to assist the victim in any way.

> Timothy Shurd Benton, a customer, was in the market when the [Petitioner] entered. He testified that the [Petitioner] had asked the cashier "to step outside, he had something to show her." Benton left the market, got in his car and started to leave the parking lot. He testified that, as he had begun to leave, he heard an "explosion." He looked over his shoulder out the window

of his car and saw the [Petitioner] holding a rifle "pointed straight up in the air." He also saw the victim lying on her back on the parking lot. After deciding that another person in the market was aware of the situation and would call for help, Benton followed the [Petitioner] to the airport, where he contacted an airport police officer.

Lennell Shepheard was also in the market at the time the [Petitioner] entered. He testified that he had seen the [Petitioner] and his wife leave the store, that the [Petitioner] had not appeared angry or hostile, and that the victim had shown no signs of fear when she went outside at the [Petitioner's] request. Shepheard remained in the store until he heard the rifle shot. At that point, he opened the market door and looked outside to see what had happened. He testified that he had seen the [Petitioner] shut the back passenger door and then lean over the victim's body and state, "I told you so" approximately six times.

Endia Kendrick, the [Petitioner's] four-year-old daughter, testified on direct examination that she had seen her father shoot her mother and that her mother had had her arms up at the time. However, on cross-examination, Endia admitted that she hadn't actually seen the shooting.

Dr. Frank King, the Hamilton County Medical Examiner, testified that the victim had died of a single gunshot wound to the chest that entered her body in the left chest at forty-nine inches above the heel and exited her body at the left back at forty-nine and one-half inches above the heel.

The [Petitioner] testified that he had been moving the rifle from the front of the car to the back at the request of the victim and that it had discharged accidentally. He testified that he had been shifting it from one hand to the other when it went off. He testified that he had not pulled the trigger. He steadfastly denied that he had intended to shoot the victim, and claimed that he had been carrying the rifle in the car because he sometimes cleaned apartments near an area where he felt a gun was necessary for personal protection. He also denied making any statements as he bent over the victim, and testified that he had taken no action to assist her because he knew she was dead. The [Petitioner] also testified that he and the victim had agreed on an irreconcilable differences divorce, that an attempted reconciliation had recently failed, and that he suspected that she had had or was having an affair. He denied that he was upset or angry at his wife about the status of their relationship.

In support of his contention that the rifle fired accidentally, the [Petitioner] relied on the testimony of Officer Steve W. Miller. Officer Miller testified that he had shot himself in the foot with the rifle when he was removing it from the trunk of his car after recovering it from where the [Petitioner] had thrown it. Officer Miller testified that he had shot himself accidentally. He further testified that he could not recall whether or not his finger had been on the trigger of the gun when it fired.

Kelly Fite, a firearms examiner, testified that he had examined and tested the rifle and that, in his opinion, "[t]he only way that you can fire this rifle without breaking it is by pulling the trigger."

After the defense closed its proof, the State called Martha Kay Maston as a "rebuttal" witness. Maston testified that she had been working as a public safety officer for the Chattanooga Metropolitan Airport Police on the night of the shooting. On finding the [Petitioner] at the airport, she saw the two children in the back seat of the car. She testified that she had gotten the children out and that they were both "very upset and hysterical." She further testified that "when I got [the little girl] out of the car, she just put her arms around me and she stated that she had told daddy not to shoot mommy but he did and she fell." Maston testified that the [Petitioner's] daughter had not made any other statements and that his son had not said anything.

Kendricks, 947 S.W.2d at 878-79.

*Post-Conviction*

After the direct appeal, the Petitioner, pro se, timely filed a petition for post-conviction relief in April 1998.[2] The post-conviction court summarily dismissed the petition on the basis that the issues raised were either waived or previously determined. See Kendricks v. State, 13 S.W.3d 401, 403 (Tenn. Crim. App. 1999). On appeal, this Court held that "the post-conviction court erred in holding that the petitioner's ineffective assistance of counsel claims were barred for failure to raise them on direct appeal." Id. at 405. Accordingly, this Court reversed the post-conviction court in part and remanded the case for further proceedings, noting specifically that the Petitioner should be allowed the opportunity to amend his petition. Id. On March 16, 2000, the Petitioner filed an amended petition with the assistance of counsel. The Petitioner also filed multiple amended petitions

---

[2] The Tennessee Supreme Court denied the Petitioner's application for permission to appeal from this Court's decision on May 5, 1997.

with and without the assistance of counsel. The hearing on the Petitioner's post-conviction petitions and amended petitions ultimately occurred on multiple days in February and March 2011[3] during which the following proof was adduced:[4]

Henry Jackson Belk, Jr., a gunsmith, testified that, earlier that morning in the clerk's office, he examined the gun, a Remington Model 7400 30.06 autoloading rifle, that shot and killed the victim. He stated that he was familiar with the trigger mechanism inside the rifle, describing it as "a common trigger mechanism that is contained within a wide variety of firearms, shotguns, rim fires and center fire rifles." He added, "Generally speaking, all pumps and automatics manufactured after 1948 by Remington contain this trigger mechanism." Belk testified that the trigger mechanism is referred to as the "Remington Common Fire Control" ("the Common Fire Control").

Belk stated that the Common Fire Control was first used in the automatic shotgun in 1948, then in the pump shotgun in 1950, and then in the automatic rifle in 1951. The Common Fire Control is currently used in 23 million firearms. Because the Common Fire Control is used in different firearms, any "issue" with the trigger mechanism would not be limited to one specific type of firearm. According to Belk, the Common Fire Control is a "defective mechanism."

As to the rifle in this case, Belk stated that it had "the normal dirt, dried oil and residue common to a gun that has not been cleaned." After removing the trigger mechanism while he was on the witness stand, Belk examined the rifle and stated that "the action spring is sticky." He explained that the "action spring . . . supplie[d] the energy for the bolt to return back forward." Because the action spring was "sticky," the bolt was "not going forward as freely as it should." Belk explained that the action spring's condition was consistent with a firearm that had not been cleaned.

Turning his attention to the trigger mechanism, Belk testified about how it could malfunction:

> The general description here is this is a swing hammer mechanism; in other words, it fires by a hammer going forward and hitting a firing pin that's contained in the bolt inside the housing. The sear is the part that retains the hammer. The sear is what holds the hammer back, does not fire. On this

---

[3] It is unclear from the record why over ten years elapsed between this Court's prior opinion and the hearing on the Petitioner's amended petitions.

[4] Although there was a great deal of testimony adduced at the post-conviction hearing, we have limited our recitation of the evidence to that which is necessary for our resolution of this case.

particular mechanism, on all these Remington mechanisms, that sear is an independent part, is right here. That is an independent part, not on the end of the trigger like a Browning design is.

For that reason, and the fact that the safety only blocks the trigger, it does not block the action of the sear or the hammer, it only blocks the trigger, any debris that is captured between the sear and the slot that it is housed in, which is the housing, any debris that is caught between the bottom or the tail of the sear and the stock surface inside the housing, any debris that gathers there, any debris that gathers between the trigger yoke and the rear pivot pin and the trigger pusher arm and the bottom of the sear, any debris in any of those places, alone or in concert, can cause an insecure engagement between the hammer and the sear itself.

So even with a gun on safe, which it is now, it can still fire, which it just did. Without pulling the trigger, on safe.

Responding to questions by the court, Belk clarified: "I can pull the trigger and make it fire, just like that (indicating), or I can put it on safe without the trigger being pulled and fire it just by manipulation of the sear."

Belk continued:

The notch in the hammer determines how much debris it takes to make it fail. The notch in the hammer is about 18,000 of an inch deep, about the thickness of a matchbook cover. . . . [A]nything that totals that amount of distance can make a gun fail.

. . . .

Any of those other locations, it takes about 18,000ths in order to interfere with the secure engagement of the hammer and the sear.

Belk clarified that there were five locations in the trigger mechanism that made the mechanism "weak" and that could collect the requisite amount of debris to cause a misfire. Moreover, of the five "weak spots," "the clearance between the sear and the housing itself is usually about 4,000ths, so it would take less debris captured between those places to retard the proper motion of the sear and would also cause it to fail. So it wouldn't necessarily take as much as 18,000ths."

Belk also testified that "[t]he Remington Common Fire Control has a history of firing under outside influences other than a manual pull of the trigger. Vibration is one way that can happen. Impact. Even in one case the simple act of grabbing the gun by [the forward part of the stock] caused it to fire." Belk reiterated that the Common Fire Control "fires without the control of the trigger. It can fire out of the control of the shooter. It can discharge without any hand being on the stock."

Belk stated that, if debris caused the gun to fire unintentionally, the debris could be dislodged during the discharge. He added,

> On this semi-automatic, each time the gun is fired, the hammer goes forward, and then under great pressure and speed, the hammer is forced back again into position. So there's a lot of cycling going on.
>
> There's also the disconnector here, there's a lot of movement in the mechanism itself during firing and during manipulation after firing. And that movement, many times, dislodges the debris that actually was the causation.

Belk acknowledged that debris also can be dislodged through a gun being dropped or "banged around." He acknowledged that a drop test "many times[] destroys any evidence that was there." He explained that the standardized tests of dropping a firearm "on a hundred durometer rubber pad from a certain distance in certain orientations . . . does nothing whatsoever to analyze the mechanism and how it can fail. So the . . . drop test in itself can be destructive [by dislodging debris] without actually showing anything." He added, "[T]his particular mechanism has what is called a recapture angle. So, impact, as in dropping it on the floor, will actually recapture the sear engagement rather than dislodge it. So the . . . drop test on this particular gun is pretty much useless."

Belk opined that the rifle which shot and killed the victim "is capable of firing without a pull of the trigger, whether the safety is on or off."

Belk testified that he was first hired to work on a case involving the Common Fire Control in 1994, and he agreed that, "if someone had done some research, they would have potentially been able to find [him]." He also testified that problems with Remington firearms could be reported to the manufacturer, which maintained "some" records of complaints. According to Belk, people were complaining prior to his initial involvement. He testified that he "first identified the problem with the Remington Common Fire Control in 1970." When a "co-shooter" on a skeet-range complained of trigger problems, Belk disassembled the trigger mechanism and "found a section of lead shot debris stuck in the sear notch of the hammer." He added, "That was the first identification that [he] had of a bad mechanism, that

-7-

it could fire without a trigger being pulled." Since then, he had consulted with "many, many attorneys." One case involved a Remington 7400 that fired while it was being cleaned with an air hose. The safety on that gun had been engaged. Another gun fired while being wiped with a rag. Another gun fired when the butt-end of the stock was placed on the floor.

On cross-examination, Belk admitted that, while the trigger assembly was in the Petitioner's rifle, the rifle had not misfired during Belk's handling of it. He also admitted that he could not opine about the cleanliness of the gun in March 1994. He stated that he testified in a case involving a Remington 7400 in 1997 or 1998.

On redirect examination, Belk testified that he was familiar with a case in which a Remington shotgun containing the Common Fire Control fired while it was in a locked case and with the safety engaged. The gun was strapped to the handlebars of an ATV that had been left idling. The vibrations caused the gun to fire. Belk stated that he had been consulted on "probably two dozen" cases involving the Common Fire Control in which the gun discharged and injured someone.

On re-cross examination, Belk maintained that he had previously been able to induce a misfire by "artificially introducing" debris in "any" of the previously identified "weak spots." He clarified that he induced these misfires in "cutaway" guns.

Sergeant Steve Miller of the Chattanooga Police Department ("CPD") testified that, on the night the victim was killed, he was assigned to the case as a crime scene investigator. He testified that the firearm was not located at the scene of the shooting. When a "[c]all came across the police radio that a gun had been located down Airport Road," Sgt. Miller went to locate the firearm. He located the rifle on the side of Airport Road and noted that there was no clip in it. He photographed the rifle and collected it for evidence, placing it in the trunk of his patrol car. Sgt. Miller transported the rifle back to the police service center on Amnicola Highway.

Sgt. Miller agreed that he was handling the rifle carefully in order to preserve fingerprints. He also acknowledged that he testified at trial that he had a jacket in his left hand and that he "grabbed" the rifle from the trunk of his patrol car with his right hand and "pointed it in a downward motion" towards the pavement. When Sgt. Miller pointed it in the downward motion, the rifle discharged, injuring his left foot. Sgt. Miller testified that he "can't say with a hundred percent accuracy" whether his fingers were anywhere near the trigger but stated that "[t]hey shouldn't have been."

Sgt. Miller acknowledged his signature on the bottom of a report prepared by Michael Taylor on March 7, 1994 ("the Taylor report"). The Taylor report, admitted into evidence,

reflected that James Gann was the first officer to respond to Sgt. Miller's injury, and Sgt. Miller's recollection at the post-conviction hearing was consistent: that Officer James Gann came out of the service building to see what had happened after Sgt. Miller shot himself. Sgt. Miller also acknowledged that the Taylor report indicated that he told the "initial officer that he had both hands on the rifle and did not have his finger near the trigger." Sgt. Miller testified that he suffered "a massive foot injury" that was "extremely painful." Sgt. Miller agreed that the wound also was stressful.

On cross-examination, Sgt. Miller agreed that he was called by the State as a witness at the Petitioner's trial. He agreed that defense counsel questioned him at the trial and asked questions about where his fingers were with respect to the trigger when he shot himself. He also remembered that defense counsel's cross-examination was "tough."

On redirect examination, Sgt. Miller testified that defense counsel did not interview him prior to the trial.

Glenn Sims, retired from the CPD, acknowledged that he prepared a police report in connection with Sgt. Miller's incident, but he did not recall speaking with Sgt. Miller. He acknowledged that, according to his report, Sgt. Miller "was taking the firearm . . . that he had collected into evidence, out of the truck of the vehicle [and] it discharged[.]" The report further reflected that "the rifle swung down, [Sgt. Miller] wasn't sure if it hit his foot or the ground, but it went off, hitting Miller in the left inside foot." Sims agreed that the report reflected that the rifle "just went off."

James A. Gann testified that he was employed by the CPD in 1994 and that he was one of the officers who investigated Sgt. Miller's incident. He stated that he was in the office when he heard "a loud recoil of a gun." Gann went outside to investigate and saw that Sgt. Miller was shot in the foot. Gann radioed for an ambulance and alerted the appropriate people who "had to be advised on a shooting." Gann stated that Sgt. Miller was "in a lot of pain, bleeding, and starting to go into shock." Gann could not recall whether he spoke to Sgt. Miller about what had happened, explaining that he "was more concerned with his foot, he was bleeding." Referring to a police report that Sgt. Glenn Sims had prepared, Gann acknowledged that Sgt. Miller had told Gann that, while Sgt. Miller was taking the rifle out of the trunk, the gun "just went off." Gann also testified that he was not contacted by anyone from the public defender's office before the Petitioner's trial.

Officer Michael Holbrook of the CPD testified that he was dispatched to Erlanger Hospital to respond to an accident involving Sgt. Miller. Officer Holbrook spoke to Sgt. Miller at the hospital and prepared a report regarding their conversation. Officer Holbrook testified that Sgt. Miller told him that "as he was taking the rifle out of the trunk of his patrol

car, the rifle went off and shot him in the foot." Sgt. Miller also told Officer Holbrook that his hands were not on the rifle's trigger. Officer Holbrook's report was consistent with his testimony and contained the following narrative: "As he was lifting out the rifle, the weapon went off and struck him in the left foot. [Sgt.] Miller states that he picked it up with both hands and his finger was not near the trigger." Officer Holbrook's report, dated March 7, 1994, was admitted as an exhibit.

The Petitioner's trial lawyer ("Trial Counsel") testified that he worked for the public defender's office in 1994 and represented the Petitioner at trial. He stated that two investigators assisted him in investigating the case. Trial Counsel agreed that the Petitioner's appointed counsel in general sessions waived the preliminary hearing in exchange for "an open file policy."

Trial Counsel testified that, from the beginning, the Petitioner maintained that the rifle accidentally discharged. He also testified that Sgt. Miller had made statements indicating that "he was not holding the gun anywhere near the trigger housing and it discharged, shooting him in the foot." Trial Counsel stated that he never looked for an expert witness to support the Petitioner's accidental discharge claim. He testified that the public defender's office informally consulted with a gunsmith who was a former Red Bank police officer, but he did not remember whether he spoke to him about this case. Trial Counsel also agreed that he performed no research regarding the trigger mechanism in the Remington 7400 rifle. He added, "[a]s a matter of fact, when I heard on NPR, a year or so ago, that the Remington trigger mechanism was faulty and [there had] been several apparent accidental deaths as a result of it, you're the first person I contacted, because I thought, I remembered it was a Remington and I thought it was something very important." Trial Counsel generally recalled that the State's expert, Kelly Fite, performed a "drop test" on the rifle. He agreed that Fite's report did not indicate that Fite inspected the trigger mechanism.

Asked whether it would have been beneficial for an expert to testify on the Petitioner's behalf about the trigger mechanism, Trial Counsel answered, "In hindsight, especially with the knowledge now that there have been so many problems with the Remington trigger mechanism, yeah." Asked about his knowledge of any discussions in the industry regarding the trigger mechanism misfiring, Trial Counsel responded:

> I wasn't aware of any. And I will point out, at the time, I was the only public defender in Division II, and in that period of time in little over four years, I probably tried, literally, 40 first degree murder cases, settled another 40 to 50, and I will concede I didn't put nearly as much time in on his case or any other cases that I tried as I do now in my private practice, because I've got a lot more time. My average caseload every Thursday for settlement day was

between 20 and 30 defendants. My average month included at least 2 if not 3 trials. So I wasn't aware of the issue with the trigger pull.

Trial counsel also added that, although he had "a fundamental knowledge of firearms, [he] was not aware of it and . . . [he] didn't know it and [he] didn't get an expert." He also explained,

I thought [Sgt.] Miller would testify consistently with what I knew to be his statements, and I thought that would come in and I thought that when that did come in, I could use that very effectively to say, okay, if [the Petitioner] can't accidentally have that gun [go] off, neither can [Sgt.] Miller, so, therefore, you got to presume that [Sgt.] Miller shot himself in the foot on purpose. That was my whole line of reasoning in this case.

Trial Counsel testified that he "was not prepared for [Sgt.] Miller to say he couldn't remember, because there was not any doubt in [Trial Counsel's] mind, at least, when [they] started trying this case, that he was going to stick to his prior statements." Accordingly, Trial Counsel had no "backup plan" to call other officers to testify about what Sgt. Miller had told them after he shot himself. Trial counsel felt "sandbagged" by Sgt. Miller's trial testimony. He recalled the trial court refusing to allow him to introduce one of the reports generated about Sgt. Miller's injury in which Sgt. Miller reported that his hands had not been near the rifle's trigger when it misfired. He did not request to make an offer of proof. He also did not attempt to introduce Sgt. Miller's statements as excited utterances, explaining, "[i]n the heat of the trial, I didn't see that."

Trial Counsel agreed that both Lennell Shepheard and Sgt. Miller's testimony at trial differed from their statements that the State provided the defense during discovery. Trial Counsel stated that the first time he heard Shepheard claim the Petitioner stated "I told you so" was during Shepheard's testimony. Trial Counsel agreed that he was never provided notice by the State prior to these two witnesses testifying that the substance of their pretrial statements had changed materially. Trial counsel also stated that, although he was not the Petitioner's counsel at the preliminary hearing stage, he would expect "in exchange for the waiver of a preliminary hearing, especially in a first degree murder case, that there would be some extra benefit to come to the defendant through the discovery process." He added, "if [Sgt.] Miller was going to change his story, we should have been made aware of that, if Mr. Shepheard was going to add to his story, we should have been made aware of that."

On cross-examination, Trial Counsel stated that he began practicing law in Tennessee in April 1978 and had been in continuous practice since that time. At the time of the Petitioner's trial, Trial Counsel had been practicing law for sixteen years, primarily in

criminal defense. Trial Counsel also stated that he was employed at the public defender's office at the time of the Petitioner's trial and had worked in that capacity for approximately five years. Trial Counsel had tried at least sixty to seventy cases by 1994, including murder cases, less-serious cases, and death penalty cases. He stated that he tried in excess of forty murder cases prior to this case. Trial Counsel testified that he was assigned this case at arraignment.

Before meeting with the Petitioner, Trial Counsel stated that the Petitioner completed an "intake sheet" wherein he wrote out his "side of the story." Trial Counsel testified that the Petitioner was on bond when he was assigned to the Petitioner's case and that he remained on bond throughout his representation of him. The offense occurred in March 1994, and the Petitioner's trial was in November 1994. Trial Counsel agreed that this was a "little quick." Trial Counsel could not recall whether the Petitioner had desired that the case proceed to trial quickly.

Trial Counsel acknowledged that he and the Petitioner discussed the strategy in the case. He stated, again, that the Petitioner maintained from the beginning that the rifle accidentally discharged and that there was "no real animosity" between him and the victim. Trial Counsel also stated that, in his preparation for the trial, he reviewed documents provided to the defense by the State. Trial Counsel testified that he typically would meet at the district attorney's office to review documents the State provided him in a case. He could not recall particularly whether he had a meeting in the district attorney's office in this case but stated that was his "standard operating procedure." He added, "I'm sure we met on it several times, not just one time." Trial Counsel stated that he was "confident" that the standard discovery motions were filed in this case although he could not specifically recall filing them. He stated that he filed the "standard motions" with every appointment he received. Pursuant to those discovery motions, Trial Counsel stated that he received documents from the State in this case and that he reviewed them to prepare for the trial. He also stated that the documents included the names of witnesses, and he agreed that the documents also included witness statements "in theory."

Trial Counsel recalled discussing the Petitioner's testimony with him prior to trial. He was "pretty confident" that he and the Petitioner "went through sit-downs where [Trial Counsel] cross-examined" the Petitioner. He added that, for every trial in which the defendant was going to testify, he would "sit down and grill them" so that they could anticipate what cross-examination would be like.

Trial Counsel did not recall specifically "familiarizing [him]self with the schematic of the [rifle]" prior to the trial, but stated that he was "relatively familiar with guns." Although Trial Counsel could not recall specifically looking at the rifle before the trial, he

stated, "I'm sure I did. . . . I'm sure I looked at it in your office too." Trial Counsel also could not recall specifically his cross-examination of Sgt. Miller. However, he stated, "I try to be vigorous [in cross-examination] especially when I think somebody's not telling the truth, and I thought that he wasn't telling the truth." He also recalled calling Sgt. Miller to testify during the defense's proof. He acknowledged that he recalled Sgt. Miller with the purpose of trying to impeach him with prior inconsistent statements.

Richard Mabee testified that, as of the time of the post-conviction hearing, he had been an assistant public defender for approximately nineteen years. He represented the Petitioner at the Petitioner's preliminary hearing. Mabee testified regarding the "one-time sheet" for the Petitioner's case, which was admitted as an exhibit at the hearing. According to Mabee, a one-time sheet lists basic information about the defendant, identifies the judge and the charges, and the disposition of the case at the general sessions level. According to Mabee, the disposition on the Petitioner's one-time sheet provided, "waived to grand jury, $50,000 bond. DA agreed to show everything." Mabee testified that this latter notation indicated that he had talked to the district attorney assigned to the case, and the district attorney had said, "[I]f you'll waive preliminary hearing, we'll show you everything in our file." Mabee stated that he then would have presented this information to the Petitioner and that it would have been up to the Petitioner to decide whether to waive the preliminary hearing.

On cross-examination, Mabee agreed that the notations on the Petitioner's one-time sheet appeared to be his handwriting. Mabee explained that, when public defenders get appointed in general sessions, they "open up a one-time sheet" which means that the public defender represented that defendant one time at the preliminary hearing. Mabee also clarified that the judge previously would have signed the order of appointment at the bottom of the one-time sheet prior to the public defender's notations regarding the disposition of the case.

On re-direct examination, Mabee stated that he made the notation, "[W]e'll show you everything in our file," because "that's exactly the words the [district attorney] said to [him]." Mabee added that, after his representation of someone, he would take the one-time sheet back to the public defender's office where it was placed in a "big drawer of one-time sheets." He stated, "[A]fter someone [was] appointed in a higher court, they may or may not get that one-time sheet."

The Petitioner testified that the first time Trial Counsel met with him was at the county jail. During this initial meeting, the Petitioner completed an "intake sheet" and told Trial Counsel that the rifle had "accidentally discharged." Trial Counsel informed the

-13-

Petitioner that Sgt. Miller had shot himself with the Petitioner's rifle and told the Petitioner that Sgt. Miller's incident supported the Petitioner's account of what had occurred.

The Petitioner recalled only two meetings with Trial Counsel after he was released on bond: one meeting occurred on or around June 1, 1994, and the second meeting occurred two or three months before trial. The Petitioner agreed that they discussed "trial strategy" during these meetings and their defense that the rifle accidentally discharged. During one of their meetings, Trial Counsel asked the Petitioner what had happened on the day of the incident, and the Petitioner informed him what he did that day. The Petitioner denied that Trial Counsel ever told him "that any evidence in this case would be damning to [him]," including the fact that he threw the rifle out of his car window. He also did not recall that Trial Counsel "went through a cross-examination of [him]."

The Petitioner stated that he got the rifle at least ten years before the killing and that he had shot it numerous times. The Petitioner testified that, although he wiped down the outside of the rifle, he never did "any maintenance in regards to the inside" of it because he did not know he was supposed to. He agreed that he testified at trial that he had never had a problem with the rifle accidentally discharging during the time he owned it.

The State asked the Petitioner whether it was Trial Counsel's "idea to use accidental discharge as the theory of the case[.]" The Petitioner responded, "I mean he's the lawyer, I mean he makes the ultimate decision, so I guess I have to say so, yes, based upon . . . his investigation and everything, yeah, I'd say it was."

After considering the proof, the post-conviction court denied relief, and this appeal followed. Initially, the Petitioner contends that the post-conviction court utilized an incorrect analysis in concluding that the Petitioner failed to demonstrate that he received the ineffective assistance of counsel at trial. The Petitioner also contends that he received the ineffective assistance of counsel at trial in the following particulars: (1) Trial Counsel failed to adduce expert testimony about the rifle's defective trigger mechanism which causes accidental shootings; and (2) Trial Counsel performed deficiently vis-a-vis Sgt. Miller. The Petitioner also raises several other issues which, given our disposition of this matter, we decline to address.

## Standard of Review

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-203 (1997). To prevail on a post-conviction

claim of a constitutional violation, the petitioner must prove his or her "allegations of fact by clear and convincing evidence." Tenn. Code Ann. § 40-30-210(f) (1997). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

### *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[5] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-203; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106,

---

[5] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

116 (Tenn. 2006) (quoting <u>Strickland</u>, 466 U.S. at 688). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

<u>Baxter</u>, 523 S.W.2d at 934-35 (quoting <u>Beasley v. United States</u>, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." <u>Howell v. State</u>, 185 S.W.3d 319, 326 (Tenn. 2006) (citing <u>Strickland</u>, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" <u>State v. Honeycutt</u>, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting <u>Strickland</u>, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. <u>Rhoden v. State</u>, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." <u>Cooper v. State</u>, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." <u>Vaughn</u>, 202 S.W.3d at 116 (citing <u>Strickland</u>, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." <u>Pylant</u>, 263 S.W.3d at 869 (citing <u>State v. Burns</u>, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of <u>Strickland</u>." <u>Id.</u>

*Alleged Deficiencies*

In assessing the Petitioner's claims, we turn first to whether he established that Trial Counsel was deficient in representing him at trial. To make this determination, we consider

both the trial record and the post-conviction record in light of the Petitioner's defense at trial: that the rifle fired accidentally. In seeking to establish this defense, the Petitioner had available three types of proof. First, the Petitioner had his own testimony. To be effective, however, the Petitioner's testimony had to be perceived as credible by the jury. Second, Sgt. Miller had made pretrial statements indicating that the rifle fired while he was handling it without his finger on the trigger. This proof was crucial to bolster both the substance of the Petitioner's defense and the Petitioner's own credibility. Third, expert testimony was available to prove that the trigger mechanism in the rifle was defective and could have caused the rifle to fire without the trigger being pulled. This proof was also crucial to the substance of the Petitioner's defense, as well as to both bolstering the Petitioner's credibility and challenging the State's expert proof.

The Petitioner contends that Trial Counsel was deficient in failing to adduce expert proof about the trigger mechanism in the rifle. We agree. There is no question in this case that the Petitioner shot and killed his wife with the rifle admitted into evidence. The key question was whether the Petitioner deliberately pulled the trigger or whether the gun discharged accidentally. In our view, the expert testimony adduced at the post-conviction hearing on this issue was absolutely crucial to this inquiry. The fact that the post-conviction court described this evidence as "favorable to the defense" implies that Belk was a credible witness. Belk testified that he was hired in 1994 to work on another case involving the Common Fire Control and that, if Trial Counsel had done the research, Trial Counsel could have found him. Belk also testified that problems with the Common Fire Control had been reported prior to his initial involvement in the 1994 case. Indeed, Belk first discovered the problem with the Remington trigger mechanism in 1970. Trial Counsel testified that he did not investigate whether there was expert proof available about the gun misfiring.[6] Accordingly, while the post-conviction court did not make a specific finding about whether Trial Counsel's performance in this regard was deficient, we hold that Trial Counsel was deficient in failing to adduce this proof at trial.

The Petitioner also contends that Trial Counsel was deficient in failing to adduce, as substantive evidence, Sgt. Miller's pretrial statements that the rifle had fired while he was handling it and while his hands were not near the trigger. Again, we must agree that Trial Counsel's performance was deficient in this respect. The Petitioner established at the post-conviction hearing that, immediately after being shot by the rifle while he was handling it,

---

[6] We note that, according to a "Chattanooga Police Supplement Report" prepared by Sgt. Rawlston, Sgt. Rawlston "contacted Special Agent Jack Scott of the U. S. Treasury Bureau of Alcohol Tobacco and Firearms" on March 8, 1994, and that Sp. Agent Scott would "conduct research into the history of the Remington Model 7400 Rifle which was utilized in this incident." The State did not call Sp. Agent Scott to testify at the Petitioner's trial.

Sgt. Miller told Gann that he "did not have his finger near the trigger" of the gun at the time the gun fired. A short time later, while Sgt. Miller was in the hospital, Sgt. Miller told Holbrook that, at the time the rifle fired and struck him in the foot, Sgt. Miller's "finger was not near the trigger." Again, this proof was crucial to the Petitioner's defense. As Trial Counsel acknowledged during the post-conviction hearing, proof of Sgt. Miller's statements at the time he was shot, both in the parking lot and at the hospital, were "excited utterances" and, as such, were admissible as exceptions to the hearsay rule. See Tenn. R. Evid. 803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."); see also State v. Banks, 271 S.W.3d 90, 116-18 (Tenn. 2008) (holding that statement made approximately six hours after declarant was shot was admissible as an excited utterance); State v. Stout, 46 S.W.3d 689, 700 (Tenn. 2001) (holding that declarant's statements made twelve hours after the event were admissible as excited utterances); Rickey Williams v. State, No. W2006-00605-CCA-R3-PC, 2007 WL 2120174, at *7 (Tenn. Crim. App. July 24, 2007) (recognizing that "the length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance").

Accordingly, when Sgt. Miller's memory proved unreliable at the trial, Trial Counsel should have called the persons to whom Sgt. Miller had made the statements and adduced the necessary proof in that manner. Although Trial Counsel testified at the post-conviction hearing that, in the "heat" of the trial, this approach did not occur to him, we hold that Trial Counsel should have anticipated a forgetful witness and been prepared to adduce the proof, of which he was aware, in another manner. Trial Counsel's performance was deficient in this regard. See, e.g., Timothy Flood v. State, No. E2009-00294-CCA-R3-PC, 2010 WL 1068184, at *9 (Tenn. Crim. App. Mar. 24, 2010) (holding in post-conviction case that "counsel was deficient for failing to comply with the Tennessee Rules of Evidence"), perm. app. denied (Tenn. Aug. 25, 2010); People v. Cortez, 296 A.D.2d 465, 466 (N.Y. App. Div. 2002) (holding that counsel was deficient due, in part, to her "lack of familiarity with the rules of evidence").

The Petitioner contends that both Trial Counsel and appellate counsel performed deficiently in other respects. However, given our disposition of this case on the basis of the above-identified deficiencies, we deem it unnecessary to address these remaining claims of deficient performance. Accordingly, we turn now to the question of whether Trial Counsel's deficient performance was prejudicial to the Petitioner.

*Prejudice*

Initially, the Petitioner contends that the post-conviction court utilized an erroneous legal analysis in determining that he failed to establish that he received ineffective assistance

of counsel at trial. We agree. Of particular concern is the post-conviction court's analysis of Trial Counsel's failure to adduce expert proof about the possibility that the Petitioner's rifle discharged without his pulling the trigger:

> The [P]etitioner alleges that counsel was ineffective in not consulting or calling a firearms expert to rebut the state's theory and Mr. Fite's testimony that the rifle did not accidentally discharge. In support of the allegation, he submits expert evidence that trigger mechanisms like the one in the gun in issue present a risk of accidental discharge and, contrary to Mr. Fite's apparent belief, the existence of the risk is not subject to proof or disproof by means of drop tests.

> The Court agrees with the [P]etitioner that this new evidence is favorable to the defense. *The [P]etitioner, however, must prove more than this; he must prove by clear and convincing evidence that the new evidence is so favorable that counsel's failure to present it at trial had an effect on the verdict. This, the Court finds, he does not do.* Even if one disregards Mr. Fite's trial testimony suggesting that accidental discharge was impossible and accepts Mr. Belk's testimony indicating that, because of the trigger mechanism in the gun, accidental discharge was possible, significant weaknesses in the theory of the defense, specifically, unfavorable eyewitness evidence and the [P]etitioner's own ambiguous actions in leaving the scene and discarding the gun, still remain. The Court therefore finds no prejudice in counsel's performance in this respect.

The post-conviction court's use of an incorrect analytical framework is further demonstrated in the "Conclusion" section of its memorandum denying relief:

> The standard for post-conviction relief is high: clear and convincing evidence. On appeal, there was sufficient evidence to support the conviction. Now, after the post-conviction hearing, the Court cannot say that there is clear and convincing evidence that the victim's death was an accident or even that it was only knowing, not premeditated.

As set forth above, a post-conviction petitioner's burden of proof in a claim that he is entitled to a new trial due to the ineffective assistance of counsel at trial is to establish, by clear and convincing evidence, *allegations of fact* supporting his claim that trial counsel's assistance at trial was ineffective. Allegations of fact include the actions that trial counsel did and did not take in preparing for and conducting the petitioner's defense at trial. If those allegations of fact are supported by clear and convincing evidence, and if the clear and

convincing evidence establishes that trial counsel performed deficiently – a conclusion of law – then the petitioner has satisfied the first prong of his ineffective assistance of counsel claim.

As our supreme court has explained, this first prong includes both proof and then a legal analysis of the significance of that proof:

> Tennessee Code Annotated section 40-30-110(f) (2006) provides that the "petitioner shall have the burden of proving the *allegations of fact* by clear and convincing evidence." (emphasis added). This inquiry does not implicate the Strickland inquiry. Pursuant to section 40-30-110(f), the petitioner is required to prove the *fact* of counsel's alleged error by clear and convincing evidence. If that burden of proof is met, the court then must assess under Strickland whether that error "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 687-88, and whether the error raised "a reasonable probability . . . that the result of the proceedings would have been different," id. at 694.

Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009) (citations omitted).

Once the post-conviction court assesses the proof and draws the legal conclusion that trial counsel's performance was deficient, the post-conviction court must turn to the second prong: prejudice. As to this second prong, the relevant inquiry is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhard v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). As our supreme court has recognized, "'a court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached [by the jury] would *reasonably likely* have been different absent the errors.'" Pylant, 263 S.W.3d at 874 (quoting Strickland, 466 U.S. at 696) (emphasis added in Pylant). Significantly, it is *not* the petitioner's burden to establish by clear and convincing evidence that his lawyer's deficient performance actually *had* an effect on the verdict. See id. at 875 n.30. Nor, contrary to the post-conviction court's approach in this case, should the post-conviction court analyze this prejudice prong through an inquiry into the sufficiency of the evidence adduced at trial. Id. at 875. Rather, as our supreme court has recognized, "'[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.'" Id. (quoting Strickland, 466 U.S. at 694). Accordingly, we hold that the post-conviction court failed to apply the correct analysis to the Petitioner's claims.

We also hold that, under the proper Strickland analysis, Trial Counsel's deficient performance in failing to adduce expert proof about the faulty trigger mechanism in the rifle was prejudicial to the defense in a number of ways. First, Belk's testimony would have corroborated the Petitioner's explanation of the shooting. At trial, the jury had no definitive account other than the Petitioner's that the gun fired accidentally. While Trial Counsel assumed that he would be able to prove an accidental discharge through Sgt. Miller, Trial Counsel's assumption was wrong. Moreover, Trial Counsel did not make a strategic decision to rely solely on Sgt. Miller's testimony after investigating the possibility of expert testimony. Rather, Trial Counsel simply did not investigate the possibility of expert testimony in support of the defense. Given the other evidence in the case that circumstantially was very damaging to the Petitioner's account, Belk's corroborative testimony was critical to bolstering the Petitioner's credibility. Indeed, the post-conviction court noted that the Petitioner's testimony at trial "was critical to the defense, *it being the only direct evidence supporting the theory of accident*." (Emphasis added). Belk's testimony would have been additional direct evidence that the rifle fired accidentally.

Second, Belk's testimony would have provided an alternative expert opinion to Fite's. Moreover, Belk testified that Fite's opinion was suspect because the drop tests that Fite performed were, according to Belk, essentially useless in evaluating whether the trigger mechanism in the rifle had caused it to misfire.[7] Without Belk, the jury had no scientific or mechanical explanation sufficient to discredit Fite's expert opinion.

Finally, Belk's testimony would have provided the jury with an additional reason to suspect Shepheard's testimony about the Petitioner's declarations of "I told you so" after the victim was shot.[8] Thus, Belk's testimony would have assisted the Petitioner's defense on multiple levels.

Certainly, had the jury heard and rejected Belk's testimony, the proof would have supported its decision that the Petitioner shot and killed his wife deliberately and with premeditation. But the jury was deprived of this critical choice by Trial Counsel's deficient

_____

[7] Fite testified at trial that the rifle was "not broken," that it was "in good operating condition," and that the trigger safety functioned. To determine if the rifle would fire accidentally, he dropped the rifle with the hammer cocked several times. He also checked the rifle to determine if it would "slam fire," which involved a malfunction of the bolt. He testified that the rifle did not "slam fire." He also tested the trigger safety which he described as blocking the trigger when engaged. He concluded that the "only way [he] can get this rifle to fire was by pulling the trigger." Fite did not testify that he removed and evaluated the trigger mechanism.

[8] Trial Counsel established at trial that Shepheard had not reported the Petitioner's alleged declarations in Shepheard's statement to the police shortly after the shooting.

performance.  The jury also was deprived by Trial Counsel's deficient performance of substantive evidence concerning Sgt. Miller's initial explanations of how he came to be shot by the rifle, i.e., without his having touched the trigger.  Again, this proof was critical to the theory of the defense.[9]

The prejudicial effect of these deficiencies is clear when considered in light of the trial court's comments at the conclusion of the motion for new trial:

> It was a remarkable case.  I've never had another case quite like it where the evidence – I've commented on this before – where the evidence seesawed back and forth.  For example, the evidence about the weapon where the State proved that the gun would not go off accidentally and then the property officer shot himself in the foot with it; and where the [Petitioner] proved good character which is, as we used to say, good character is a witness[.]
>
> . . . .
>
> It was an awfully close question on the facts.  During the trial I found myself going back and forth.  After the trial I kept thinking was I satisfied with the verdict of the jury or I guess more to the point did I under the law. . . . I found that to be an extremely close question, difficult question.

We hold that, had Trial Counsel put on expert proof about the Common Fire Control, and had Trial Counsel elicited admissible substantive evidence about Sgt. Miller's initial explanations of how he came to be shot by the rifle, it is reasonably likely that the jury would have accredited the Petitioner's version of events and convicted him of a lesser degree of homicide.   Thus, we hold that these deficiencies in Trial Counsel's performance cast the jury's verdict into sufficient doubt as to render it unreliable.  Accordingly, we conclude that the Petitioner established both that Trial Counsel performed deficiently and that Trial Counsel's deficient performance rendered the jury's verdict unreliable.  Therefore, we are constrained to conclude that the  Petitioner is entitled to post-conviction relief in the form of a new trial.

---

[9] We acknowledge that, in the direct appeal of this matter, this Court concluded that the trial court's erroneous exclusion of Officer Sims' testimony about Sgt. Miller's prior inconsistent statement was harmless error.  Kendricks, 947 S.W.2d at 882.  However, this Court was considering this testimony as impeachment evidence relevant to demonstrate to the jury that Sgt. Miller's memory was faulty, and not as substantive evidence that the gun had misfired.  We consider the distinction to be significant.

As set forth above, the Petitioner contends that Trial Counsel was ineffective in numerous other ways, as well. Given our holdings with respect to Trial Counsel's failure to adduce expert proof about the Common Fire Control and his failure to adduce Sgt. Miller's excited utterances, we decline to address these remaining assertions. We also decline to address the Petitioner's claim of ineffective assistance of counsel on direct appeal.

## Conclusion

The Petitioner established that he received the ineffective assistance of counsel at trial. Accordingly, the Petitioner is entitled to a new trial. We reverse the judgment of the post-conviction court, vacate the Petitioner's conviction, and remand this matter for further proceedings consistent with this opinion.

_____
JEFFREY S. BIVINS, JUDGE